UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 10-11724-RWZ


MARIA SARMENTO

v.

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration


MEMORANDUM OF DECISION

May 1, 2012

ZOBEL, D.J.

Plaintiff, Maria Sarmento, brings this action under 42 U.S.C. § 405(g) seeking

reversal of a decision by defendant, the Commissioner of the Social Security

Administration, denying her application for disability benefits. Plaintiff maintains that the

Administrative Law Judge ("ALJ"), whose unfavorable May 11, 2010, decision became

the final decision of the Commissioner, erred in assessing her credibility.

**I.  Social Security Disability Insurance Framework**

Pursuant to regulations promulgated by the Social Security Administration, a

person is disabled if she has an "inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 430 20 C.F.R. § 404.1505(a); 20 C.F.R.

§ 416.905(a). To meet this definition, a person must have a severe impairment that

makes her unable to do her past relevant work or any other substantial gainful work

that exists in the economy. (Id.)

In determining disability, the Commissioner follows a five-step inquiry:

First, is the claimant currently employed? If [s]he is, the claimant is automatically considered not disabled.

Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If [s]he does not have an impairment of at least this degree of severity, [s]he is automatically not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled. ....

Fourth ... does the claimant's impairment prevent [her] from performing work of the sort [s]he has done in the past? If not, [s]he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent [her] from performing other work of the sort found in the economy? If so [s]he is disabled; if not [s]he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

The ALJ's findings of fact are conclusive if supported by substantial evidence. 42

U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 390 (1971); Manso-Pizarro v.

Secretary of Health and Human Services, 76 F.3d 15, 16 (1st Cir. 1996). They are not

conclusive, however, "when derived by ignoring evidence, misapplying the law, or

judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.

1999). Moreover, the ALJ cannot ignore "the 'body of evidence' opposed to his view."

Dedis v. Chater, 956 F.Supp. 45, 51 (D. Mass.1997). This court determines "whether

the final decision is supported by substantial evidence and whether the correct legal

standard was used." Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). Substantial

evidence is 'more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Richardson, 402

U.S. 389 at 390. In determining the substantiality of the evidence, the court will

examine the record as a whole, including whatever in the record fairly detracts from the

weight of the Secretary's decision. Rohrberg v. Apfel, 26 F. Supp. 2d 303, 306 (D.

Mass. 1998).

## II.  Background and Administrative Record

Plaintiff applied for Social Security Disability Insurance ("SSDI") benefits on

November 3, 2006. The claim was denied on May 29, 2007. Plaintiff requested review

by a Federal Reviewing Official on June 26, 2007, which denied the claims on May 14,

2008.  In response to plaintiff's request for a hearing on July 10, 2008, the ALJ

conducted a hearing on June 23, 2009, and issued an unfavorable decision on August

4, 2009. The Decision Review Board selected the plaintiff's claim for review, and on

November 6, 2009, remanded the claim to the ALJ primarily to re-evaluate the plaintiff's

credibility and to consider her apparent category II obesity. After a supplemental

hearing on March 22, 2010, the ALJ issued a second unfavorable decision on May 11,

2010. The Decision Review Board again selected the plaintiff's claim for review but this

time found no reason to disturb the ALJ's decision. Thus, the ALJ's May 11, 2010,

decision stands as the final decision of the Commissioner.  In this appeal, plaintiff

challenges the ALJ's determination that her complaints of back and leg pain are not

credible.

The record sets forth the following facts:

**A.  Plaintiff's Injury and Lower Back Pain**

The plaintiff, a certified nurse's aid ("CNA") for 19 years, suffered a lower back injury while moving a patient on May 23, 2006. She was 41 at the time of the injury and has a ninth grade education level. As a result of her injury, she was immediately admitted and treated for three days at Charlton Hospital.  Thus began a regimen of physician, physical therapy and pain clinic visits.

Dr. Farrel Douglas' May 24, 2006, consultation notes recount the accident as follows:  plaintiff "was pushing a patient to turn them [sic] when she suddenly felt a pop in her low-back and had sudden pain in her low-back. She continued working and as she bathed patients the pain progressively worsened. She then helped boost a patient up in bed and when she attempt to lift patient during the boost her low-back pain suddenly increased and she was unable to move because of the excruciating low-back pain." Dr. Douglas, a neurologist, noted that plaintiff "appeared to have mechanical low-back pain caused by her work activities, especially the heavy lifting." Dr. Douglas noted that plaintiff had an episode of low-back pain in 2000, he also reviewed her MRI which showed a disc bulge at the L4-L5 level, and he noted that the "loss of hydration in the disk is consistent with degenerative disc disease."

On June 9, 2006, Dr. James Keffer's, D.O., physical examination of plaintiff revealed "very significant tenderness to palpation throughout the lower lumbar paraspinal regions, including in particular the midline of the lower lumbar spine at approximately L4-L5 and L5-S1 levels." He agreed that the "MRI report indicates some

broad disc bulging at L4-L5... [and] disc degeneration focal to L4-L5 with disc

desiccation," and concluded that it is likely this disc causing her problem.  On June 14,

2006, Dr. Keffer administered an epidural steroid injection; however, plaintiff reported

this did not relieve her pain. Although Dr. Keffer noted that plaintiff's MRI did not show

evidence of nerve impingement he explained "she may have some radiculitis of a

chemical nature." On July 31, 2006, he reported that plaintiff exhibited "decreased

pinprick in the distal right leg including L4, L5 and S1 dermatomes."Although he did not

believe plaintiff was a candidate for surgery, he recommended an "aggressive" spine

rehabilitation program with pain management.

From August 2006 until October 2006, plaintiff was treated at Fall River Physical

Therapy. The treatment notes reflect her complaints about difficulties with activities of

daily living and noted that sitting, walking, standing, bending, stooping and sleeping

aggravated her pain.

On September 9, 2006, Dr. Douglas again examined plaintiff and concluded that

she had pain with straight leg raising and was "tender in the midline from L4-S1 with

mild sacroiliac joint tenderness bilaterally." His impression was that plaintiff suffered

from mechanical low back pain although there was no evidence of radiculopathy.[1]

---

[1] "Radiculopathy refers to disease of the spinal nerve roots. Radiculopathy produces pain, numbness, or weakness radiating from the spine... Pain may be felt in a region corresponding to a dermatome, an area of skin innervated by the sensory fibers of a given spinal nerve or a dynatome, an area in which pain is felt when a given spinal nerve is irritated... Radiculopathies are categorized according to which part of the spinal cord is affected. Thus, there are cervical (neck), thoracic (middle back), and lumbar (lower back) radiculopathies. Lumbar radiculopathy is also known a sciatica... Radiculopathy is a possible diagnosis when numbness, pain, weakness, or paresthesia of the extremities or torso are reported by a patient, especially in a dermatomal pattern."  Stacey L. Chamberlin (Editor), Brigham Narins (Editor), Larry Gilman, PhD, Gale Encyclopedia of Neurological Disorders, GALE-NEURO 3435200297 (2006).

On October 16, 2006 plaintiff had another MRI performed at the Fall River Diagnostic Center which again indicated a general bulge of the disk at L4-L5, and indicated a flattening of the ventral aspect of the thecal sac but without significant alteration of the nerve roots and degenerative desiccation.

Next, from October 2006 to January 2008, plaintiff was treated at St. Ann's Hospital Pain Management Center by attending physician Dr. Allison Gorski.  Upon Dr. Gorski's first examination, she noted that plaintiff appeared "to have some nerve root irritation possibly from the disk bulge" and that there "may be some leakage of disk material causing the inflammation and the positive tension sign on her right leg that radiates into her right thigh." Dr. Gorski's physical exam revealed a positive straight leg raise on the right. Dr. Gorski recommended another epidural steroid injection, rest, "and then hopefully return to work." By December 2006 plaintiff again indicated that she did not experience any significant relief from the second injection and was reporting pain at a level of 8 on an 8/10 scale. At this point, plaintiff was also taking a panoply of prescription drugs directed at pain relief including "Lidoderm patches, Tizanidine, Tramadol, Lyrica and Cymbalta." In August 2007, Dr. Gorski performed a nerve root block procedure which plaintiff reported was also unsuccessful; thereafter, Dr. Gorski suggested spinal cord stimulation treatment.

On February 1, 2007, Dr. Joseph Doerr, a physician at Prima Care Diagnostic Rehab, performed an electrodiagnostic test (also known as an "electromyography" or "EMG") which suggested right S1 radiculopathy. Dr. Doerr's examination of plaintiff also

revealed decreased sensation in the lateral foot, decreased right ankle jerk, and diffuse tenderness. He noted plaintiff "remains disabled in terms of any prolonged sitting." In June of 2007, Dr. Gorski agreed with Dr. Doerr's findings that the EMG exhibited radiculopathy, as did Dr. Phillips who reviewed the results on May 29, 2007.

On April 5, 2007 Dr. William Straub, a non-examining Disability Determination Services (DDS) consultative physician, reviewed plaintiff's medical record and concluded that she had mechanical low back pain which restricted her to work at light levels of exertion with the only limitation being that she could only stand or walk for approximately two hours a day.

The treatment notes of Dr. Manuel Mendes, plaintiff's primary care physician, recount her complaints of pain in her lower back radiating into her right buttocks and down her right leg, limited range of motion, muscle spasms and lumbar tenderness. In September 2008, Dr. Mendes completed a physical capacities assessment form. He opined that in an eight-hour workday, plaintiff could only sit one hour, stand two hours, and walk one hour and noted that plaintiff requires frequent alterations of position. He regularly noted that plaintiff experienced severe pain, and that on at least one occasion she became bedridden for several days. He limited the plaintiff to lifting and carrying five pounds and no bending, crawling or climbing. He stated there was no evidence that plaintiff was a "malingerer," and that plaintiff's pain was so severe that it interfered with her activities of daily living, concentration, sleep, and social relationships. Dr. Mendes had treated plaintiff for many years before her injury, as his treatment notes begin in 2001.

**B.  Plaintiff's Depression and Other Mental Impairments**

Shortly after plaintiff's back injury, plaintiff began to experience spates of depression and anxiety which gradually became worse. In September 2006, Dr. Douglas noted that she appeared moderately depressed. In November 2007, Dr. Gorski indicated that plaintiff exhibited a considerable amount of anxiety and depression, so much so, that she could not recommend proceeding with the spinal cord stimulation therapy until it was resolved; she also prescribed Wellbutrin, an antidepressant. On May 15, 2007, Dr. Robert Sharpley, an examining consultative physician, met with plaintiff and she explained to him that she had difficulty engaging in normal activities, relied upon her husband and daughters to do household chores, had no hobbies, and constantly felt sad and depressed. Dr. Sharpley diagnosed recurrent depressive reaction and noted plaintiff was preoccupied with her physical condition. On May 24, 2007, Dr. Fischer, a non-examining DDS consultative physician, reviewed Dr. Sharpley's report and concluded that the plaintiff's depression was a moderate limitation on her ability to carry out instruction, maintain concentration, operate according to a schedule, be punctional, and complete a normal workday.

Beginning in June 2007 and through 2010, plaintiff was treated for depression by Maria Ferreira, M.S.W., L.I.C.S.W., a clinical therapist. Ms. Ferreira's notes indicate that plaintiff exhibited feelings of guilt and low self esteem stemming from her inability to work and to accept her medical condition, together with her need to seek help with daily activities from her mother. In her Social Security Administration questionnaire dated September 25, 2008, Ms. Ferreira disagreed with Dr. Fischer's conclusions and

found instead that as a result of depression and anxiety plaintiff was markedly unable to respond appropriately to supervision, co-workers, or the pressures of a routine work environment. In September 2009, plaintiff began treatment at the Figman Psychiatric Group for major depressive disorder, impaired sleep, social isolation, and panic attacks.

### C.  June 23, 2009 Administrative Hearing

On June 23, 2009, the ALJ held an administrative hearing at which plaintiff testified that she was in constant "24/7 pain," and that although the degree of the pain varied, it was typically between a 5 and 6, but reached as high as 8 and that cold and damp conditions aggravate the pain. She stated she is able to sit for only 15-20 minutes before feeling uncomfortable and can stand or walk for only 10 minutes. She indicated that she does drive to visit her doctors and to pick up her mother who only lives five minutes from her and who often spends the day with her until her husband returns home from work. She testified that her mother, two daughters, and husband perform the household chores, that she can prepare a simple meal such as toast, that she has no hobbies, does not read or spend time with friends and only watches TV sparingly. She is unable to shave her legs or clip her toenails because she cannot bend, and she only gets four hours of sleep on an average per night due to her inability to stay in one position very long and because she experiences racing thoughts. The ALJ questioned her briefly on her prescription medications and plaintiff indicated that they cause her to adopt a mellow demeanor, drowsiness and, at times, induce nausea and vomiting.      Dr. Stephen Kaplan, an internist and rheumatologist, testified as

the medical expert and guided the ALJ through the record in great detail.  He

concluded "We have a lady with what appears to be a very, very significant – severe –

what we call mechanical back pain... [from] muscle spasm, which is clearly and well

documented irritating the S1 nerve producing pain in the distribution of the S1 nerve

down into the right leg and marked limitation of movement with her back, which again

had been consistent throughout the record." He noted that plaintiff's complaints "have

been very consistent problems of both pain and the S1 radiculopathy."

The ALJ then asked specifically if plaintiff's condition was operable, Dr. Kaplan

answered in the negative explaining that "there is nothing to operate on in terms of a

mechanical cause of the mechanical back pain.... [because the term] mechanical [ ]

means [ ] that its primarily related to the muscles." In response to the ALJ's request for

ALJ comment on Dr. Doerr's recommendation that plaintiff not engage in prolonged

sitting, Dr. Kaplan agreed because for "someone with radiculopathy and severe muscle

spasms ... sitting actually produces more pressure on the back than any other position."

To the ALJ's question whether putting aside the issue of pain plaintiff would be

capable of light exertion, Dr. Kaplan gave the qualified response "well, if you put aside

the question of pain, yes."

### D.  The ALJ's August 4, 2009 Decision

With respect to the five-step inquiry, the ALJ found that plaintiff met the insured

status requirements of the Social Security Act; that the claimant has not engaged in

substantial gainful activity since May 23, 2006 (step 1); that she had the following

severe impairments: lumbar degenerative disc disease, chronic pain syndrome, and

depression (step 2). She determined that plaintiff had the residual functional capacity to perform light work with the limitation that she should not stand for more than two hours per day, and with a moderate limitation in concentration and responding appropriately to customary work pressures. She found that plaintiff's impairments were not equivalent to any of the conditions described in Appendix 1 of the regulations (step 3), but that she could no longer perform as a CNA (step 4). At step 5, the ALJ determined that there were a significant number of jobs available in the national economy taking into account the claimant's age, education, work experience, and residual functional capacity, such as a "foot press operator, assembler, general production laborer and laborer." The ALJ did not credit plaintiff's assertion of pain because "she is able to shower, dress herself, drive a car to her doctor's appointments, and to pick up her mother... [and] the claimant sat quite comfortably at hearing, which lasted over 1 hour."

The ALJ gave little weight to Dr. Mendes' lift/carry and strength assessment and his notation that plaintiff "becomes bedridden at times secondary to pain" because they were inconsistent with Dr. Doerr's and Dr. Mendes' prior assessments of plaintiff exhibiting normal to good strength. She also gave Ms. Ferreira's assessment of plaintiff's social functioning little weight.  Ms. Ferreira's suggested degree of plaintiff''s mental impairment is inconsistent with her not being treated by a psychiatrist or clinical psychologist.

### E.  Review Board Remand

The Decision Review Board remanded the decision to the ALJ for resolution of three issues. First, it found that the decision did not contain an evaluation of Dr.

Kaplan's testimony and therefore the ALJ's credibility determination was not supported

by substantial evidence. Second, according to the evidence, the plaintiff's body mass

index put her in a category of class II obesity which was not considered by the ALJ.

Third, it directed the ALJ to obtain the treatment records of Dr. Phillips and, if

warranted, a medical source statement from him about what activities the plaintiff could

still engage in despite the constellation of her impairments.[2]

### F.  March 22, 2010 Supplemental Hearing

After the remand the ALJ conducted a supplemental hearing on March 22, 2010;

again plaintiff, a medical and vocational expert, testified. Plaintiff's testimony was

nearly identical to her original testimony. However, she added, consistent with Dr.

Mendes' treatment notes, that on some days she was unable to get out of bed because

her pain was so severe and that she had to use a bed pan to relieve herself during that

time. She also stated that the reason she does not spend time with friends is because

she does not "want anybody to see me the way I was and who I am now." She

explained that the longest she could sit in a chair even with shifting and occasional

walking would be a half hour. At the hearing Dr. Edward Spindell, an orthopedic

surgeon, testified as a medical expert in lieu of Dr. Kaplan. He acknowledged that two

MRIs showed mild bulges in plaintiff's disc at the L4-L5  and L5-S1, and that she had

an EMG that was determined to be suggestive of S1 radiculopathy; however, he noted

that the examination by Dr. Phillips, a neurosurgeon, and  Dr. Douglas, a neurologist,

---

[2] It is unclear from the record whether or not this happened; however, plaintiff does not press the issues in her appeal.

were unremarkable. He stated that in his opinion plaintiff's neurological findings have

generally been normal, and that there was no objective basis for plaintiff's pain or for

Dr. Mendes' or Dr. Doerr's finding that plaintiff should not engage in prolonged sitting.

Dr. Spindell acknowledged that plaintiff appeared to have "considerable psychiatric

complaints."  There were no significant differences from the initial hearing of the

vocational expert's testimony.

### G.  The ALJ's May 11, 2010 Decision

The ALJ made the same step 1, 3, and 4 findings, but now at step 2 to the list of

severe impairments disc radiculopathy, obesity, and anxiety disorder. Nevertheless, at

step 5 the ALJ again determined that there were a significant number of jobs available

in the national economy appropriate for plaintiff such as "small parts assembler,

cashier, parking lot attendant, systems surveillance monitor, jewelry stringer and

carding machine operator."

The ALJ decided that plaintiff's medically determinable impairments could

reasonably be expected to cause her alleged symptoms but that the intensity,

persistence and limiting effects of these symptoms were not credible to the extent they

were inconsistent with her being able to perform light work.  She further found plaintiffs

testimony that she "becomes bedridden at times" unsupported by objective medical

evidence in the record specifically citing the mild symptomatology revealed by the

MRIs.  She again gave little weight to Dr. Mendes' physical capacities assessment for

the same reasons as before.

The ALJ appears to have discredited Dr. Kaplan's conclusions in a footnote on

the basis that he is "only a Board certified internist,"[3] and his recommendations were inconsistent with the assessment by Dr. Spindell. The opinion did not address Dr. Kaplan's testimony regarding the consistency of plaintiff's complaints when viewed against the objective medical basis for plaintiff's symptomatology.

The ALJ concluded that plaintiff's alleged symptoms and disabling limitations are inconsistent with the "diagnostic findings," and she opined that plaintiff's own treating or examining physicians would have recommended back surgery had they been as severe as claimed.

In this decision, the ALJ made no mention of plaintiff's demeanor at either hearing, nor did she discuss at all whether plaintiff's daily activities were consistent with her claimed functional limitations as she had done in the first decision.

## III. Analysis

The major dispute in this case centers on the adequacy of the ALJ's evaluation of plaintiff's complaints of pain caused by her lower back injury.

When assessing a claimant's allegations of pain, the ALJ must first find that the individual's impairments, as demonstrated by "medical signs and laboratory findings," "could reasonably be expected to produce the symptoms." Social Security Ruling ("SSR") 96-7p, 61 Fed.Reg. 34,483 (July 2, 1996). If a claimant meets that threshold, as the ALJ found plaintiff did, the ALJ must evaluate whether "the intensity,

---

[3] Plaintiff correctly notes that Dr. Kaplan is a rheumatologist as well. Rheumatism is defined by Stedman's Medical Dictionary (27th Ed., 2003) as "term applied to various conditions with pain or other symptoms of articular origin or related to other elements of the musculoskeletal system."

persistence, and functionally limiting effects" of the pain would affect the individual's

ability to work. SSR 96-7p. This second step necessitates an appraisal of the credibility

of the plaintiff's statements regarding her symptoms and their functional effects.

The First Circuit has explained that when evaluating the credibility of a disability

claimant's subjective allegations of pain, the ALJ must inquire into six factors.  Avery v.

Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). These factors (the

"Avery factors") are:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
> 4. Treatment, other than medication, for relief of pain;
> 5. Functional restrictions; and
> 6. The claimant's daily activities.

The ALJ may not rely on the support or lack of the objective medical evidence

alone in determining the claimant's credibility.

As SSR 96-7p warns:

> Because symptoms, such as pain, sometimes suggest a greater severity
> of impairment than can be shown by objective medical evidence alone,
> the adjudicator must carefully consider the individual's statements....
> [Complaints regarding such symptoms] may not be disregarded solely
> because they are not substantiated by objective medical evidence.... The
> determination or decision must contain specific reasons for the finding on
> credibility, supported by the evidence in the case record, and must be
> sufficiently specific to make clear to the individual and to any subsequent
> reviewers the weight the adjudicator gave to the individual's statements
> and the reasons for that weight.

Nguyen v. Chater, 172 F.3d 31, 34 (1st Cir.1999) (per curiam) (ALJ required to

"consider evidence in addition to medical tests"); Da Rosa v. Sec'y of Health & Human

Servs., 803 F.2d 24, 26 (1st Cir.1986) (same); Pires v. Astrue, 553 F. Supp. 2d 15, 23 (D. Mass. 2008) ("the ALJ may not reject evidence elucidated during the Avery inquiry solely based on inconsistency with objective medical evidence."); Valiquette v. Astrue, 498 F. Supp.2d 424, 433 (D. Mass. 2007)("dissonance between the objective medical assessment and the plaintiff's description of the level of pain [experienced] ... merely poses the question of the credibility of [plaintiff's] complaints, it does not answer it.").

An ALJ is "free to disbelieve Plaintiff's subjective testimony;" however, he or she "'must make specific findings as to the relevant evidence he considered in determining to disbelieve [him or her].'" DaRosa, 803 F.2d at 26." Avery v. Astrue, CIV.A. 06-30143-KPN, 2007 WL 2028881 (D. Mass. July 10, 2007). Generally, even when an ALJ sufficiently develops the record by inquiring into the Avery factors, he or she must still perform a "thorough discussion and analysis" and identify "the weight [s]he gave or (decided not to give) to Plaintiff's testimony with regard to all six Avery factors." Id. at *7 (internal citations omitted).

While the ALJ did sufficiently develop the record with regard to the Avery factors, she did not adequately explain either her application of them, or the reason for disregarding any of the evidence supportive of plaintiff other than her disagreement with the objective medical record. Specifically, the ALJ cited mild MRI results and the fact that none of plaintiff's physicians recommended surgery as the basis for her determination. However, as the relevant authority directs, a disconnect between the objective medical record and plaintiff's testimony merely starts the credibility analysis; it does not conclude it.

Further, the ALJ did not address Dr. Kaplan's in-depth review of the entire medical record and his evaluation of the consistency of plaintiff's complaints over time and across physicians.  Although the ALJ mentioned plaintiff's 19-year prior work history as a CNA, she did consider it in her decision.  Irlanda Ortiz v. Sec'y of Health & Human Services, 955 F.2d 765, 766 (1st Cir. 1991) ("where the objective medical evidence does not support the degree of pain alleged by claimant, the ALJ also must consider the daily activities described by claimant and his prior work record").

Moreover, while the ALJ did add obesity as one of plaintiff's severe impairments at step 3 she did not address the effect of plaintiff's weight gain on her condition and, by extension, her credibility.  The ALJ noted that plaintiff was 5' 2" with a body weight of 200 pounds.  This weight gain certainly corroborates plaintiff's accounts of the effect of debilitating pain on her emotional well being and ultimately on her everyday activities. Nearly every physician in the record also noted that plaintiff had a muted affect and was suffering from depression, and its onset coincided with her injury and progressively worsened.

In sum, the record paints a picture of a woman (1) who was gainfully employed for 19 years; (2) who had a serious workplace accident requiring three days of hospital care, (3) that resulted in (I) years of treatments and therapies and prescription drugs (all of which have proved relatively ineffective), (ii) remarkably consistent complaints of pain (operating in the same manner) over a lengthy period under the care of numerous physicians, and (iii) severe limitations on her daily activities; and (4) whose symptoms have induced depression and significant weight gain. The ALJ simply did not provide

any reason why plaintiff's complaints of pain and description of her functional limitations should not be believed, other than that they appear to be inconsistent with parts of the medical record. That, as a matter of law, is not enough. Therefore, the determination of the ALJ to reject plaintiff's credibility is not supported by substantial evidence.

Given the lengthy history of this case, the number of reviews and contradictory decisions, and the extensive record, further consideration is not warranted. See Larlee v. Astrue, 694 F. Supp. 2d 80, 87 (D. Mass. 2010)(citing Seavey v. Barnhart, 276 F.3d 1, 13 (1st Cir. 2001)); Rohrberg, 26 F. Supp. 2d at 312 (internal citations omitted).

## IV. Conclusion

Plaintiff's motion for an order reversing the Commissioner's denial of benefits is ALLOWED. The Commissioner's motion to affirm is DENIED, and his decision is REVERSED and REMANDED solely for calculation and award of benefits.

| May 1, 2012 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
| | UNITED STATES DISTRICT JUDGE |